Filed 3/12/13  P. v. Martinez CA27

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>CRISTOBAL MARTINEZ et al.,<br><br>   Defendants and Appellants. | B237168<br><br>(Los Angeles County<br>Super. Ct. No. BA377300) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Dennis Landin, Judge.  Affirmed.

Joy A. Maulitz, under appointment by the Court of Appeal, for Defendant and Appellant Cristobal Martinez.

Ava R. Stralla, under appointment by the Court of Appeal, for Defendant and Appellant Armando Zavala.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, and Linda C. Johnson and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

—————————————

Appellants Cristobal Martinez and Armando Zavala appeal their judgments of conviction following a joint jury trial. Martinez was convicted of one count of attempted voluntary manslaughter (Pen. Code,[1] §§ 664, 192), and Zavala was convicted of one count of attempted premeditated murder (§§ 664, 187, subd. (a)). Martinez does not raise any issues in the opening brief filed by his appointed appellate counsel. Zavala argues in his appeal that the trial court prejudicially erred in instructing the jury on eyewitness identification testimony with CALCRIM No. 315 and that his trial counsel rendered ineffective assistance in failing to present expert testimony on the unreliability of eyewitness identifications. We affirm.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

## I. The Charges

The Los Angeles County District Attorney jointly charged Martinez and Zavala with the attempted willful, deliberate and premeditated murders of George Lopez and Jose Aguilar (§§ 664, 187, subd. (a)). It was alleged that each defendant and a principal personally and intentionally discharged a firearm which caused great bodily injury within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e)(1). It was also alleged that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)). Martinez and Zavala each pleaded not guilty to the charged offenses and denied the enhancement allegations.

## II. Prosecution Evidence

### A. Margarita Lopez

On May 31, 2010, George Lopez was residing at a multi-unit rental house on West 50th Street in Los Angeles. Lopez lived in the house with his girlfriend, Kathy Pinones,

---

[1] All further statutory references are to the Penal Code.

2

and his daughter, Margarita Lopez.[2]  On that day, Lopez was gathered with his family and friends in the front patio area of the house for a Memorial Day barbecue.  Jose Aguilar was one of Lopez's guests.  As Margarita was standing on the patio, she noticed a gray SUV drive by the house and then slowly drive by again an hour later.  The driver appeared to glance at the house when he drove by the second time.  A few minutes later, the SUV drove by the house a third time and stopped across the street.  Three men exited the vehicle.  Martinez exited from the front passenger seat and Zavala exited from the rear passenger seat.

Martinez, Zavala, and the unidentified driver approached the group gathered at the front of the house.  The driver repeatedly asked the young men in the group where they were from, and one of Margarita's cousins replied, "we don't bang."  At some point, Lopez intervened and indicated to the men that, while he was a former gang member, his family was not affiliated with gangs.  He asked the men if they had a problem.  The men told Lopez that he should not be holding parties at the house because it "wasn't his hood for him to be having people over."  Martinez in particular said "this is 50th street hood."

Lopez and the three men argued as they moved across the street.  The driver pushed Lopez and Lopez pushed him back.  Lopez said to the driver, "Just chill.  Just leave it alone. . . I don't want problems."  The driver pulled a gun from the waistband of his pants and held it at his side.  In response, Lopez told the driver to "handle it like a man and put [the] gun down."  When the driver refused, Lopez tried to grab the gun from him and a struggle ensued.  As Lopez wrestled with the driver on the ground, Martinez grabbed Lopez from behind and lifted him up.  Martinez pinned Lopez's arms behind his head while the driver began firing his gun at Lopez from a distance of four to five feet.  The driver fired three shots at Lopez, hitting him once in his shoulder and twice in his stomach.  Immediately after Lopez was shot, Aguilar ran toward him.  Zavala, who also had a gun, turned to Aguilar and shot him three to four times.  The driver also may have

---

**2**      For clarity and convenience, and not out of disrespect, we shall refer to George Lopez as "Lopez" and his daughter, Margarita Lopez, as "Margarita."

fired a shot at Avila. Zavala, Martinez, and the driver then got back into their vehicle and fled the scene.

Shortly after the shooting, Margarita was interviewed at the scene by the police. Margarita told the responding officer that the suspects had exited a silver SUV, stated that "this is 50th Street hood," and then engaged in a physical altercation with Lopez. Margarita also said that, during the altercation, one of the suspects shot Lopez while another shot Aguilar.

On June 3, 2010, Margarita was shown a photographic lineup that included Martinez and Zavala. Margarita identified Martinez as the man who grabbed and held Lopez when he was shot. After reviewing Zavala's photograph, Margarita told the police that he "possibly" was the person from the rear passenger seat, but she was not sure because she did not get a "real good look at him."[3] At a December 2010 preliminary hearing, Margarita made an in-court identification of Martinez. She did not identify Zavala, but indicated at the hearing that he resembled the person from the rear passenger seat. At the August 2011 trial, Margarita identified Martinez as the man from the front passenger seat who grabbed and held Lopez as the driver shot him. Margarita identified Zavala as the man from the rear passenger seat who turned and shot Aguilar as the group was leaving.

At trial, Margarita testified that she was familiar with Martinez prior to the shooting. About twice a week, Margarita had seen Martinez, whom she knew as "Sicko," visiting the family that resided in the upstairs unit of the house. Margarita did not know the other two men, but she had seen each of them in or around the house on one prior occasion. Two weeks before the shooting, Margarita had seen the driver standing by the side of the house with a group of people. A few weeks before the shooting, Margarita

---

[3] At the preliminary hearing, Margarita testified that the officer who showed her the lineup pointed to Zavala's photograph and told her that the police thought he was one of the suspects. At trial, Margarita clarified that the officer only pointed to Zavala's photograph after Margarita identified him as possibly being one of the individuals involved.

4

had seen the man who shot Aguilar in the common area of the house with one of the tenants that Martinez would visit.

Margarita also testified that she was 100 percent sure of her identification of Martinez, but was still not sure of her identification of Zavala. She stated that she did not get a good look at the man who shot Aguilar, but Zavala "seemed to look somewhat like the person." When asked to compare Zavala's lineup photograph with her recollection of the man who shot Aguilar, Margarita testified that he "resembles him a lot, but . . . it's really hard to tell." She noted that, like the shooter, Zavala was bald, light-skinned, and had a thin face, but the shooter had a tattoo on his neck whereas Zavala's photograph did not show any neck tattoos. When asked to compare Zavala's height and build with that of the man who shot Aguilar, Margarita testified that they were "the same."

### B.    Katie Pinones

Pinones, Lopez's girlfriend, was in the house preparing food when she heard an argument taking place outside. She saw Martinez and two or three other men pushing Lopez on the street. Pinones immediately ran to Lopez and told the men to calm down and control themselves. As Pinones stood behind Lopez, one of the men pulled out a gun and shot Lopez three times. Martinez and a third man who was tall and light-skinned were standing about 10 feet away from Lopez when he was shot. The man who shot Lopez then turned around and fired five shots at Aguilar. Pinones did not see where Aguilar was standing during the shooting because her attention was focused on Lopez, but she did recall that Aguilar tried to run away. Martinez and the other men then fled in a SUV.

On June 15, 2010, Pinones was shown a photographic lineup that included Martinez and Zavala. Pinones identified Martinez as one of the men involved and told the police that she was sure of her identification. She also told the police that the person in Zavala's photograph resembled one of the other men, but she was not sure it was him. At both the preliminary hearing and trial, Pinones made an in-court identification of Martinez as one of the perpetrators. She testified at trial that she was familiar with

5

Martinez prior to the shooting because she occasionally saw him visiting another tenant at the house. She stated that she did not know Zavala and was not sure whether he was also present at the shooting. When asked to compare Zavala's lineup photograph with her recollection of the third man, Pinones related that both men were thin, bald, and light-skinned. Pinones also testified that the officer who showed her the lineup specifically pointed to Zavala's photograph and asked if she knew him, and she told the officer she did not think that person was one of the perpetrators.

### C. Jose Aguilar

Aguilar was a guest at Lopez's barbecue. He had been drinking beer throughout the day and was moderately to heavily under the influence of alcohol at the time of the shooting. Aguilar was standing in front of the house where Lopez lived when his attention was drawn to a fight on the street. He saw Lopez struggling with three Hispanic men who were trying to take Lopez to the ground. Aguilar began to walk toward the fight when Zavala turned and fired a gun at him from a distance of less than 20 feet. Aguilar was shot twice in his stomach and three times in his leg. He recalled falling to the ground as soon as he was shot and then waking up in an ambulance. He did not recall seeing anyone shoot Lopez. Aguilar was wearing glasses for distance at the time of the shooting.

On June 14, 2010, while he was in the hospital, Aguilar was shown a photographic lineup that included Martinez and Zavala. After reviewing the photographs, Aguilar identified Zavala as one of the perpetrators and wrote the following about Zavala's photograph: "In my best recognition, I think 13 . . . was the main gun runner." Aguilar later testified that he was on pain medication at the time of his statement and meant to state that Zavala was the person who shot him. He admitted, however, that he was not certain of his photo identification at the time he was shown the lineup.[4] At the

---

[4] At the preliminary hearing, Aguilar initially testified that the officer who showed him the lineup pointed out Zavala's photograph, but he immediately clarified that the

6

preliminary hearing, Aguilar made an in-court identification of Zavala and testified that he was 100 percent certain that Zavala was the person who shot him. At trial, Aguilar again identified Zavala as the man who shot him and confirmed that he was still certain about his identification. He also testified that the man who shot him had tattoos on the back of his shaved head. Aguilar never identified Martinez as one of the other perpetrators.

### D.     Ibrahim Francis

Francis was also a guest at Lopez's barbecue. While he was standing on the front porch of the house with three other young men, Francis saw a silver SUV stop on the street. There were three Hispanic men inside the vehicle. The driver approached the house and aggressively asked the men on the porch where they were from and what they were doing in his neighborhood. One of Francis's friends answered, "we don't gang bang." The driver returned to his vehicle and looked in his rear view mirror. At that moment, Lopez and Aguilar were walking quickly up the street toward the house.

All three men exited the vehicle and engaged in a verbal altercation with Lopez and Aguilar. The driver and front passenger argued with Lopez while the rear passenger argued with Aguilar. Aguilar, who was not wearing glasses at the time, had his fists up and appeared ready to fight. The front passenger showed Lopez a gun that he had on his waistband, and a struggle ensued as the two men wrestled for the gun on the ground. After the driver helped pull the front passenger away from Lopez, the front passenger stood up and fired his gun at Lopez five times. As soon as the first shots were fired, Aguilar began running from the scene. At that point, the rear passenger also pulled out a gun and shot Aguilar from behind.

At the preliminary hearing, Francis testified that Martinez was possibly the driver or the front passenger and he was sure Martinez was the person who shot Lopez. He also

officer simply showed him the lineup and that Aguilar pointed to Zavala's photograph on his own and identified him as the perpetrator.

7

stated that Zavala was possibly the person from the rear passenger seat who shot Aguilar. At trial, Francis described both the driver and the front passenger as short and dark-skinned and the rear passenger as tall, bald, skinny, and light-skinned. Francis repeatedly testified at trial that he did not recognize Martinez or Zavala and did not see any of the men involved in the shooting in court. When asked how he felt about testifying, Francis stated as follows: "I just want to get it over with and . . . to tell you the truth, I can't say that it was them because I don't want to wrongfully accuse anyone of anything. So it will be wrong for me to even say it was them and it wasn't them because I'm not a hundred percent even sure." Francis admitted that he refused to view a photographic lineup after the shooting because he did not want to be involved in any matter related to gangs. He also admitted that he told the investigating officer on multiple occasions that he did not want any further involvement in the case.

### E. George Lopez

Lopez suffered severe injuries in the shooting and had no recollection of the events surrounding the shooting at trial. The parties stipulated that Lopez had a 2002 conviction for felony assault with force likely to cause great bodily injury.

### F. Investigating Officer

Los Angeles Police Detective Douglas Bell was the investigating officer in the case and prepared the photographic lineup that was shown to the witnesses. He selected the individuals included in the lineup based on their membership in the 50th Street gang. Detective Bell denied that he ever pointed to any of the photographs before a witness made an identification, or suggested to any witness that a particular photograph should be selected. The only civilian witnesses that Detective Bell was able to locate and contact in the case were those who testified at trial.

### G. Gang Expert

Los Angeles Police Officer Brandon Barron testified as an expert on the 50th Street gang. According to Officer Barron, the 50th Street gang had approximately 15

8

documented members, including Martinez and Zavala. The primary activities of the gang included vandalism, theft, robbery, assaults with deadly weapons, attempted murder, and murder. The shootings in this case occurred in the territory claimed by the gang. Martinez had 50th Street gang tattoos on his wrists and legs, and Zavala had 50th Street gang tattoos on his head, neck, back, and torso. Zavala also had tattoos of the initials "L.A." behind his right ear and the initials "S.C." behind his left ear. Officer Barron described two grand theft offenses committed by other members of the 50th Street gang in 2006 and 2007, and one attempted robbery offense committed by Zavala in 2007. When presented with a hypothetical based on the facts of this case, Officer Barron opined that the crimes would have been committed for the benefit of the 50th Street gang and with the intent to promote future criminal conduct by 50th Street gang members.

### III.    Defense Evidence

Neither Martinez nor Zavala called any witnesses to testify at trial. Over the prosecution's objection, the defense was permitted to present evidence that, a few weeks after the shooting of Lopez and Aguilar, Margarita was the driver of a car involved in a separate gang-related shooting committed by her friend. Margarita later testified against her friend in that case. In photographs taken a few days before that incident, Margarita was shown holding a gun and making gang signs in the company of the friend who committed the shooting. In other photographs, Margarita was shown kissing a gun.

### IV.    Verdict and Sentencing

The jury found Martinez guilty of the attempted voluntary manslaughter of Lopez, and not guilty of the attempted murder or attempted voluntary manslaughter of Aguilar. The jury made a true finding on the allegation that Martinez committed the attempted voluntary manslaughter of Lopez for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members under section 186.22, subdivision (b). The jury made a "not true" finding on the allegation that Martinez personally used a firearm within the meaning of section 12022.5, subdivision (a). The trial court sentenced Martinez to a total

9

term of six years and six months in state prison, consisting of the low term of 18 months on the attempted manslaughter count plus an additional five years on the gang enhancement.

The jury found Zavala guilty of the attempted willful, deliberate, and premeditated murder of Aguilar, and not guilty of the attempted murder or attempted voluntary manslaughter of Lopez. The jury made a true finding on the allegation that Zavala committed the attempted murder of Aguilar for the benefit of, at the direction of, or in association with a criminal street gang, and with the specific intent to promote, further, or assist in criminal conduct by gang members under section 186.22, subdivision (b). The jury also made true findings on the allegations that Zavala personally and intentionally discharged a firearm which caused great bodily injury to Aguilar within the meaning of section 12022.53, subdivisions (b), (c), (d), and (e). The trial court sentenced Zavala to a state prison term of 40 years to life, consisting of a life term with a 15-year minimum parole eligibility on the attempted murder count and gang enhancement plus an additional 25 years to life on the section 12022.53(d) firearm enhancement. The court stayed the sentence on the remaining firearm enhancements.

Martinez and Zavala each filed a timely notice of appeal.

## DISCUSSION

### I.      Martinez's Appeal

We appointed counsel to represent Martinez on appeal. After examination of the record, counsel filed an opening brief in which no issues were raised. On August 1, 2012, we advised Martinez he had 30 days in which to personally submit any contentions or issues he wished us to consider. No response has been received to date.

We have examined the entire record and are satisfied that Martinez's attorney has fully complied with the responsibilities of counsel and no arguable issue exists. (*Smith v. Robbins* (2000) 528 U.S. 259, 277-284; *People v. Kelly* (2006) 40 Cal.4th 106, 112-113; *People v. Wende* (1979) 25 Cal.3d 436, 441.)

10

## II.     Zavala's Appeal

Zavala raises two arguments on appeal.  First, he contends that the trial court committed prejudicial error in instructing the jury on the factors to consider in evaluating eyewitness identification testimony with CALCRIM No. 315.  Second, he claims that his trial counsel rendered ineffective assistance in failing to call an expert witness to testify about the unreliability of eyewitness identifications.

### A.     Instructional Error

Zavala first argues that the trial court violated his federal and state constitutional right to due process when it instructed the jury, pursuant to CALCRIM No. 315, that it could consider a witness's level of certainty in evaluating his or her identification of the defendants.  Citing various research studies and out-of-state cases on the reliability of eyewitness identifications, Zavala asserts that this portion of the instruction was erroneous because there is no established scientific correlation between certainty and accuracy.  This argument, however, has been repeatedly rejected by California courts.

As an initial matter, we address the Attorney General's contention that Zavala invited the alleged instructional error when his trial counsel stated that he had no objections to the proposed jury instructions identified by the trial court, which included CALCRIM No. 315.  "The doctrine of invited error bars a defendant from challenging an instruction given by the trial court when the defendant has made a 'conscious and deliberate tactical choice' to 'request' the instruction.  [Citations.]"  (*People v. Lucero* (2000) 23 Cal. 4th 692, 723-724.)  However, the mere failure to object to an instruction, as occurred here, is insufficient to show invited error.  (*People v. Moon* (2005) 37 Cal.4th 1, 29, fn. 4 [rejecting invited error claim where "defense counsel merely acquiesced to the instruction, and the record does not show whether counsel's decision was a tactical one"]; *People v. Smith* (1992) 9 Cal.App.4th 196, 207, fn. 20 [rejecting invited error

11

claim where counsel failed to object to instruction because "merely acceding to an erroneous instruction does not constitute invited error"].)[5]

CALCRIM No. 315 is an updated version of CALJIC No. 2.92. Both instructions state that, when evaluating eyewitness identification testimony, the jury should consider, among other factors, the witness's level of certainty in the identification.[6] In *People v. Wright* (1988) 45 Cal.3d 1126, 1141 (*Wright*), the California Supreme Court held that "a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence. [¶] The instruction should *not* take a position as to the *impact* of each of the psychological factors listed." The Court also expressly approved CALJIC No. 2.92, explaining that "[t]his model instruction, with appropriate modifications to take into account the evidence presented at trial, will usually provide sufficient guidance on eyewitness identification factors." (*Ibid.*) The majority in *Wright* rejected the dissent's suggestion that CALJIC No. 2.92 was deficient in failing to explain the effects of the enumerated factors because "[s]uch an instruction would improperly invade the domain

_____

**5**    Even if failure to object to CALCRIM No. 315 at trial could constitute a forfeiture of the issue on appeal, we may review any claim of instructional error that affects a defendant's substantial rights irrespective of whether there was an objection in the trial court. (§ 1259 ["appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby"]; *People v. Hudson* (2006) 38 Cal.4th 1002, 1012; *People v. Smithey* (1999) 20 Cal.4th 936, 976, fn. 7.) Whether the defendant's substantial rights were affected, however, can only be determined by deciding if the instruction as given was flawed and, if so, whether the error was prejudicial. That is, if Zavala's claim has merit, it has not been forfeited. Therefore, we necessarily review the merits of his claim that there was instructional error.

**6**    CALCRIM No. 315 specifically instructs the jury to consider 15 enumerated factors, including "[h]ow certain was the witness when he or she made an identification." CALJIC No. 2.92 instructs the jury to consider the believability of the witness and 13 other enumerated factors, including "[t]he extent to which the witness is either certain or uncertain of the identification."

12

of the jury, and confuse the roles of expert witnesses and the judge." (*Ibid*.) The *Wright* majority instead concluded that "the listing of factors to be considered by the jury will sufficiently bring to the jury's attention the appropriate factors, and that an explanation of the *effects* of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*Id*. at p. 1143.)

Citing *Wright*, subsequent cases specifically have rejected challenges to the use of the "certainty" factor in CALJIC No. 2.92. In *People v. Johnson* (1992) 3 Cal.4th 1183, 1230-1231 (*Johnson*), the California Supreme Court first noted that "CALJIC No. 2.92 normally provides sufficient guidance on the subject of eyewitness identification factors." The Court then held that the jury was properly instructed on the "certainty" factor with CALJIC No. 2.92 notwithstanding the defense's uncontroverted expert testimony that a witness's certainty in an identification did not positively correlate with its accuracy. (*Id*. at pp. 1231-1232.) The Court reasoned the jury was not required to accept the expert's testimony even if uncontradicted, and the trial court was not permitted to instruct the jury to view the evidence through the lens of the expert's theory. (*Ibid.*; see also *People v. Gaglione* (1994) 26 Cal.App.4th 1291, 1302-1303 [rejecting challenge to "certainty" factor in CALJIC No. 2.92 based on California Supreme Court's approval of instruction in *Wright* and *Johnson*], disapproved on other grounds in *People v. Martinez* (1995) 11 Cal.4th 434, 452; *People v. Sullivan* (2007) 151 Cal.App.4th 524, 561-562 [same].)

The "certainty" factor in CALCRIM No. 315 is substantively the same as the factor set forth in CALJIC No. 2.92 and approved in *Wright* and *Johnson*. We adhere to California Supreme Court precedent and accordingly conclude there was no instructional error in this case. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

### B.    Ineffective Assistance of Counsel

Zavala next asserts that he received ineffective assistance of counsel in violation of his federal and state constitutional rights when his trial counsel failed to present expert testimony on the factors affecting the reliability of eyewitness identification evidence.

13

The record reflects that, at the close of the prosecution's case, Zavala's counsel informed the trial court that he "might use an eyewitness expert." However, when trial resumed the following day, Zavala's counsel rested, subject to admission of certain exhibits. Zavala argues that his counsel's failure to call an eyewitness identification expert to testify at trial constituted deficient performance because the prosecution witnesses' identification of Zavala as one of the perpetrators was "the essence of the case" against him. While we agree that the eyewitness identification of Zavala was a critical issue in the case, we conclude that his ineffective assistance claim fails on direct appeal.

"'In assessing claims of ineffective assistance of trial counsel, we consider whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms and whether the defendant suffered prejudice to a reasonable probability, that is, a probability sufficient to undermine confidence in the outcome. [Citations.] A reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy. Defendant thus bears the burden of establishing constitutionally inadequate assistance of counsel.' [Citations.]" (*People v. Gamache* (2010) 48 Cal.4th 347, 391; see also *Strickland v. Washington* (1984) 466 U.S. 668, 694.)

The California Supreme Court has "'repeatedly emphasized that a claim of ineffective assistance is more appropriately decided in a habeas corpus proceeding.'" (*People v. Jones* (2003) 30 Cal.4th 1084, 1105.) "In order to prevail on such a claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 349; see also *People v. Lucas* (1995) 12 Cal.4th 415, 442 ["[r]eviewing courts reverse convictions on direct appeal on the ground of incompetence of counsel only if the record on appeal demonstrates there could be no rational tactical purpose for counsel's omissions"].) "If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or

14

there simply could be no satisfactory explanation. [Citation.]" (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) "Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, not on appeal.' [Citation.]" (*People v. Lucero* (2000) 23 Cal.4th 692, 728-729; see also *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267 [ineffective assistance claim relating to "why counsel acted or failed to act in the manner challenged . . . is more appropriately decided in a habeas corpus proceeding"].)

In support of his claim that his trial counsel rendered ineffective assistance in failing to present an eyewitness identification expert, Zavala primarily relies on *People v. McDonald* (1984) 37 Cal.3d 351 (*McDonald*), overruled on other grounds in *People v. Mendoza* (2000) 23 Cal.4th 896, 914. The issue in *McDonald* was whether the trial court abused its discretion in precluding the defense from introducing expert testimony on the unreliability of eyewitness identification evidence. (*McDonald*, *supra*, at p. 361.) The California Supreme Court held that "[w]hen an eyewitness identification of the defendant is a key element of the prosecution's case but is not substantially corroborated by evidence giving it independent reliability, and the defendant offers qualified expert testimony on specific psychological factors shown by the record that could have affected the accuracy of the identification but are not likely to be fully known to or understood by the jury, it will ordinarily be error to exclude that testimony." (*Id.* at p. 377.) However, *McDonald* did not consider whether the failure of defense counsel to call an eyewitness identification expert under such circumstances would constitute ineffective assistance of counsel. Thus, "*McDonald* provides no support for the claim that expert testimony must be presented by a defense attorney in *every case* where an eyewitness identification is uncorroborated." (*People v. Datt* (2010) 185 Cal.App.4th 942, 952.) To the contrary, the *McDonald* court noted that "[w]e expect that such evidence will not often be needed, and in the usual case the appellate court will continue to defer to the trial court's discretion in this matter." (*McDonald*, *supra*, at p. 377, fn. omitted.)

15

Whether to call certain witnesses is ordinarily a matter of trial tactics unless the decision results from an unreasonable failure to investigate. (*People v. Bolin* (1998) 18 Cal.4th 297, 334; see also *People v. Mitcham* (1992) 1 Cal.4th 1027, 1059 ["[t]he decisions whether . . . to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess"].) While the record on appeal reflects that Zavala's counsel considered calling an eyewitness identification expert at trial, it does not disclose the reasons for counsel's decision to ultimately forego such testimony. Nor does the record affirmatively demonstrate the absence of any rational tactical basis for counsel's decision. As the California Supreme Court has observed, "[e]xpert testimony on the psychological factors affecting eyewitness identification is often unnecessary." (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 995.) Although such testimony arguably could have been helpful to the jury in this case where the reliability of eyewitness identifications was a key issue, there may have been sound strategic reasons for counsel's decision not to call an expert. Zavala's counsel may have concluded that he could more effectively attack the accuracy of the witnesses' identifications of his client through cross-examination. He also may have concluded that the factors which could have adversely affected the reliability of the identifications in this case, such as stress and the presence of a weapon, were within the jury's common understanding and could be effectively argued to the jury without the aid of expert testimony.

"That we can hypothesize a reasonable tactical basis for defense counsel's conduct does not, of course, prove that counsel did have a reasonable tactical basis for his action or inaction. But to support a claim of ineffective assistance of counsel, defendant must prove that counsel had no such tactical purpose. [Citation.]" (*People v. Jones*, *supra*, 30 Cal.4th at 1122.) Here, the record on appeal sheds no light on the reasons why Zavala's counsel considered, but ultimately decided not to call an eyewitness identification expert at trial. Therefore, for purposes of appeal, we reject Zavala's ineffective assistance claim and conclude that it is more appropriately decided in a habeas corpus proceeding.

## DISPOSITION

The judgment is affirmed.

ZELON, J.

We concur:

PERLUSS, P. J.

JACKSON, J.

17